Good morning everyone. Our first case of the day is 163397 Brendan Dassey v. Michael Dittmann. Good morning Mr. Berg. May it please the court. Brendan Dassey chose to confess to release those terrible images of Teresa Halbach that were haunting him. The investigators encouraged him to get it out but did not apply any improper pressure. Mr. Berg, help me with this. If a police officer says to someone who is being interrogated, let's get it all out today and this will be all over. I have a two-part question for you. The first part is what would the average person think this means? Would that person think I can go home? It's done. Now the second part of the question is I want you to imagine it is not an average person but a 16-year-old with a very, very low IQ who is extremely suggestible and I would very much like you to concentrate on the suggestible. I think neither an average person nor Dassey would interpret that statement as meaning that he could go home. What if there were 20 such statements, 30 such statements? There are multiple reasons why none of those statements communicated to Dassey that he could leave. Number one, nothing the investigators said actually promised a specific benefit in exchange for cooperation. Courts consistently reject false promise theories where there hasn't been a very specific offer. Second, the only specific things the officers said were warnings. They said we can't make you any promises and anything you say can be used against you. Those warnings were there to prevent Dassey from misinterpreting anything else that the officers said. Well, do you think someone with Brendan's intellect understands that, quote, the truth will set you free is an idiom, particularly when one is sitting in a police interrogation room? You know, we said many times the government cannot promise a suspect that if he confesses he will be set free. Set free. Well, that statement is frequently understood to be an idiom and I don't think even Dassey, I don't think he would have taken that statement to mean that he can actually walk free. We have evidence in this case that his will was not overborne. We have his demeanor. He also volunteered many details in response to open-ended questions. But most importantly, perhaps, he resisted the officers over 35 times on six different topics. They asked six questions on four separate occasions about whether he actually shot Teresa. He consistently said no. They asked 15 questions on six separate occasions about whether the fire was going when he already got over there. He consistently said it was and that Avery started it. They asked eight questions in a row about whether he and Avery used the wires in the garage for anything. He consistently said no. They asked seven questions in a row about what happened to Teresa's hair. He consistently said, I don't know. I don't have it. They also challenged his answer with respect to the knife and they suggested falsely that Teresa had a tattoo. He did not give in to either of these suggestions either. When the police officer said we're cops, we're investigators and stuff like that, but right now I'm a father that has a kid your age too. I wish I could hug you and I will not leave you high and dry. Do you think those untruths cross the line? No, not at all. In other words, I'm not a cop right now. Isn't that just a blatant lie? This was an interview. The context is very important, so the difference between an interview and interrogation is crucial. When the officers went into the interview, they assumed that Dassey was simply a witness, and they communicated this to him the first time that they talked to him on February 27th. They said there are some officers that think maybe you helped Avery participate. We don't think you did participate. We think maybe you saw some things, but we think you weren't involved. So their statements must be understood in that light. They thought he was a witness and they told him that. So your position is that each of these incidents are segregated and finite and distinct and that he would not still remember those statements that they were acting as a father? I'm not sure I understand the question. Well, the different sessions. You're saying that February 27th when he said they were acting as officers but as fathers, and you're saying that then he was just being interviewed as a witness, and so are you saying then that that ended at the next session, that that wouldn't carry over at all to the next session? No, that was still true at the March 1st interview. They still thought he was a witness at that point and that he hadn't participated. So this aura, what I'm trying to get at is this aura suggesting that they were fathers is something that just didn't dissipate. The idea that they thought he was a witness didn't dissipate, so all of their statements of it's okay, we're on your side, that must all be understood in the context of what they thought because they communicated that. Well, how did the investigators not act coercively when they clearly showed frustration when he resisted or disagreed with key details and then offered praise such as now we believe you? I mean, I think if you watch the video, they showed very little frustration or praise. They were ultimately concerned about the truth. They wanted to get the truth out, and it was very clear at the beginning that Dassey was lying to them. And I did look at the tape, and there were times to me that they seemed to be frustrated with his answers and his resistance. Their main concern was the truth. The main message that they sent to Dassey was be honest, tell the truth, don't make anything up. They cautioned him repeatedly, don't guess, don't make anything up. If you don't know it, you don't know it. They didn't want him to make things up. They wanted the truth. In the examples that you cited of non-coercive confessions, you did it on pages 31 and 33 of the brief and elsewhere. Are there any examples of juveniles who had been evaluated by a psychologist and found to be particularly suggestible? Are there any such cases? And if so, I'd appreciate a cite. Etherly, we think, is the closest. Say it again. Etherly, we think, is the closest case. I don't know that there was a test for suggestibility, but Etherly was 15 years old and he was illiterate. He had lower intellectual functioning than Dassey did. I also think I read the testimony about suggestibility. I think it's highly suspect. I think they did a very good job on cross-examination of poking holes in the suggestibility analysis that was done in this case. The test that was done for suggestibility was something like a complicated story from England was read to Dassey and he had to recount the details from it, and then they told him when he was wrong. But we know that Dassey doesn't have a good memory for book knowledge, and so it could have been that he just couldn't have remembered the things that were told to him. Your brief states that only a few times did the investigators ask questions that assumed a detail that Dassey had either not provided or hinted at. The example the brief gives, of course, is the question who shot her in the head. It seems to me that it only takes one incident, one incident of planting information to taint a confession, especially in a vulnerable suspect. The vital piece of information in this case, of course, was that poor Teresa had been shot in the head before she was burned. After several unsuccessful attempts, however, to get Dassey to acknowledge the gunshot to the head by hinting that something had happened to her head, the investigators finally came out and they revealed the key part of information that only the murderer would have known. I guess what I'm trying to get at here, in short, is isn't once enough. It's an entirely appropriate interview tactic to confront a suspect with the details that the investigators know about the crime. This court has said that repeatedly. Sturtevant, Hardaway, those are just a couple examples. After he had gone through this litany of we cut her hair, we did various things, the police officer finally comes out and says, all right, she was shot in the head. You know, who shot her in the head? You think that's all right? I think, yes, I think it's entirely appropriate for an investigator to confront a suspect with what they know about the crime. Now, obviously, it's preferable for the suspect to come out with it on their own, but it's not always possible, and it makes a lot of sense why Dassey couldn't think about that fact at that moment. The conversation that they were having was about what happened in the bedroom. The investigators didn't know where Teresa was shot at that point. They didn't find out until later that she was shot in the garage. So when they started asking about the head, Dassey couldn't think of the shooting because his mind was on the bedroom, and that's where all of the other things happened. So I want to ask you some questions regarding the Wisconsin Appellate Court decision. But first, you agree that age is a relevant factor in determining whether a confession is voluntary. I do. And the Supreme Court said in Gaul and other cases that juvenile confessions must be evaluated with special care. So I want to know exactly where the Wisconsin Appellate Court decision says or considers Dassey's age and where it was given special care. Dassey's age is listed in the opinion. Yeah, it's listed, but special care is more than just listing, don't you think? The Wisconsin Court of Appeals opinion was also based on the trial court's finding, and that was a lot more explicit about Dassey's age. And exactly what was said that the appellate court made reference to in their decision. In terms of the trial court, I'm just saying listing the factor doesn't necessarily mean special care. There's no evidence that it did not consider age. It clearly was aware of age. It mentioned it. This court in Carter said we're never going to review a state court opinion simply because it lists a factor in the facts section of an opinion and doesn't read it in the analysis. So on habeas, you can't assume that the Court of Appeals didn't consider age. It clearly was aware of age. It said it was basing its opinion on the trial court's decision, and the trial court's decision spent a lot of time on age. So I think on habeas especially, you can't assume that the Wisconsin Court of Appeals did not consider age. Can we talk about ineffective assistance of counsel? Because if the reasoning of Sullivan is that a lawyer cannot serve two masters, then doesn't this situation apply? I mean, it's clear that Kaczynski and his investigators saw it as their duty to get him to confess so that that confession could be used against Stephen Avery. It's important to remember we're on habeas here. It's important to remember that we're on habeas review here. All that matters is clearly established Supreme Court case law. The Supreme Court said in Mickens, Sullivan is only clearly established law for multiple concurrent conflicts. That's not even alleged here. So that's the end of the Sullivan claim as far as we're concerned. Ms. Burke. Oh, I'm sorry. Could I go back to the confession for a moment? During the videotaped confession, Mr. Dassey comes out with a lot of details that he supplies. The opposing side has explained that as details that had been publicized. I'm wondering if you have any response to that general point and whether we have any record concerning which of those facts that he ultimately volunteered without suggestion might or might not have come from publicity. I think there's a few minor points. There's a few facts that we know had been released by the police officers, but the vast majority of them had not. Do we have a record about that somewhere? Not that I could find, no. Okay. And then I also wanted to ask you, and I realize this gets fairly grisly, given the condition of the body when it was discovered, but was there physical evidence of a rape or of a wound to the throat? No, because the body was totally destroyed. So those come only from Dassey's confession? That's right, yes. And would not have been publicized ahead of time? That's right, yes. Okay. And with respect to the Wisconsin Court of Appeals opinion, we say the court referring to the district court, the trial court, found that investigators used normal speaking tones. That's correct. Right. No hectoring. I think that's correct. Right. No threats. Right. That's correct. And they say no promises of leniency. Right. Now, obviously there were vague promises of leniency, right? I think in context, no, there weren't even implications of leniency, for two reasons. One, they went into the interview thinking that he was a witness, and they communicated that to him. Second, they thought, based on what Dassey told them, that to the extent he participated, Avery made him do it by threatening to stab him like he had stabbed Teresa. So their statements, it's not your fault, he made you do it, it's okay, a lot of those were premised on those two things. They thought he was a witness, and if he participated, he was forced into it. Well, look, I think we all know that the police are allowed to induce confessions by some misdirection and deception. Right. In essence, out-and-out fraud, fraudulent promises, as in some extreme cases, this will be a confidential discussion, for example, just between us. Those kinds of things can cause problems. If the Wisconsin Court of Appeals had written no legally relevant promises of leniency, I think that would probably be accurate here. That's not quite what they said. I think that's clearly what they were referring to, and in any event, I think there weren't even implied promises of leniency. Even if there were, there were specific warnings that contradicted any implications. We can't make any promises, they said that explicitly, and we have evidence that his will was not overborne. He resisted the officers multiple times. He volunteered many details. You can see his demeanor. So, no, I don't think there were even implied promises here. Was the May 13th interview not introduced at trial because there was a ruling to that effect or because the government chose not to do so? I'm not sure the answer to that. Hmm. Because for all the reasons that the May 13th interview was unreliable, doesn't it also make the phone call between Brendan and his mother unreliable? No, I don't think so. That phone call occurred from his own will. He chose to make the call. He was warned that it was recorded. After the police officer... The police were not present at the time of the phone call? Of course not, but the police officers had said to him, we think you should call your mother before we talk to her. You don't want to be lying to your mom. Well, I mean, I don't know. I still think it was voluntary, entirely voluntary, because it was out of the presence of police. But we also have his statements to his cousin, which weren't even preceded by any investigative action. Yeah, but if you watch her testimony, she's crying on the stand. It's very clear that she's lying. All right. And let me just ask one other question about Etherly, because you're relying on that. But isn't that distinguishable from our situation, because the investigators there only made one truthful promise to the juvenile that they tell the judge about cooperation, and our situation is different? Certainly it's different in that respect, but we think it's the closest analog that we have. In terms of Supreme Court cases, we think fair is the closest analog that we have. But let me just reiterate, we're on habeas review, right? So you're going to have factors that cut in different directions in every case. There are many factors in this case that cut in the state court's favor. And where that's true, reasonable minds can certainly differ. Reasonable minds could definitely conclude that Dassey's confession was voluntary here. He was Mirandized, even though he didn't have to be. He was interviewed for only three hours in the middle of the day. He was offered food and breaks. Both his mother and he consented to the interview. He signed a Miranda waiver. He resisted the officers multiple times. There's just no evidence that his will was overborne. If anything, there's evidence to the contrary. And all of the precedent supports the state here. It doesn't support Dassey. And things like, we don't think you have anything to worry about. We're in your corner. We already know. Just tell us it's okay. We're going to help you through this. No matter what you did, we can work through it. It's okay as long as you can, as long as you're being honest. If you lie about that, there's going to be problems. If you helped him, it's okay because he was telling you to do it. This will all be over with. Honesty is the only thing that will set you free. And I could go on and on. None of those statements are specific promises. That's what the cases require. They were directly contradicted by a statement, we can't make you any promises. In context, it's very clear that none of those statements even implied leniency because they thought he was a witness and they thought he had been threatened to participate. And fourth, we know that his will wasn't overborne because we have evidence of it. He resisted the officers, he provided many details, and his demeanor doesn't look intimidated or threatened on the video. I'd like to save my 20 seconds. You're half a second? Yeah, right. Don't you worry. I'm going to give you time. Thank you. Thank you. Okay. Ms. Neureider. Good morning, Your Honors. May it please the Court. Lauren Neureider for Petitioner Appellee Brendan Dassey. I'll start, if I may, with the voluntariness issue and then move to ineffective assistance of counsel. But before I do, Judge Hamilton, you'd ask a question about whether there was a record built on the media stories that had been in circulation prior to Brendan Dassey's confession. There was an extensive record built in state post-conviction proceedings that is referenced in the district court opinion in this case at RSA 69. Sixteen-year-old, mentally limited Brendan Dassey confessed in reliance on a false promise of leniency that was unreasonably overlooked by the state courts in violation of Section 2254-D2. That promise was, quote, you're scared that you might get arrested, but, quote, I'm thinking you're all right, okay, you don't have to worry about things. They told him this was true even if he gave, quote, statements against your own interest that make you look more involved. And they gave him a free pass to confess to the worst. We already know what happened, they said, and still they offered him leniency. This message was repeated not once, not twice, but in a cumulative drumbeat over and over and was referenced before each major admission in the case. Ms. Neureider, have any cases held confessions involuntary without much more specific promises of leniency? Well, Your Honor, I think A.M. versus Butler is instructive here, quite parallel. That's the 11-year-old. Yes, he is an 11-year-old, Your Honor. Anything else? Another case? Well, I think A.M. is the most analogous case here, even though he's 11. Brendan Dassey is 16 with an IQ of 73. He's a 10th grader who can't even spell the word rack. And the promises and their effects are strikingly similar. A.M. thinks he's going to go home. He thinks he's going to go to a birthday party. And Brendan Dassey thinks he's going to go back to school. And why does he think these things? Again, this drumbeat of promises that precedes every major admission. At Separate Appendix 54, the police tell Brendan, I think you went over there to Stephen Avery's house. And they pair it with, it's okay, Brendan, we already know. And Brendan pairs it back. I want to ask you, did Brendan's appellate counsel give any reason for not asserting an ineffective assistance claim under Strickland? We were Brendan's appellate counsel, Your Honor. And the reason that we raised this claim under Kyler v. Sullivan was because that was what we found when we did the research in the case law. We found cases like Osborne v. Schillinger in the Tenth Circuit, U.S. v. Swanson in the Ninth, Thomas from the Eastern District of Michigan, which speak about attorneys aiding the state using the language of conflict, using the language of attorneys who feel as though they're operating under duties that flow both to the prosecution and to their own client. Those cases speak in the language of conflict, which is why we raised this as a Kyler issue. I really want to talk about Strickland and Sullivan a bit more, because even though the trial court found that Kaczynski's performance was deficient under Strickland, you chose to pursue the matter under Sullivan rather than Strickland. I mean, of course, Sullivan provides a more forgiving standard because it doesn't require a defendant to demonstrate prejudice. But, of course, you've got Mickens. So I think we need some help there. Certainly, Your Honor. To speak to Mickens, first of all, we've raised a D-2 and a D-1 claim. With respect to our D-2 claims, there is no need under the text of the statute to show clearly established federal law in order to clear the threshold of 2254-D. And then on 2254-A review, this court is free to apply the Sullivan standard. That's what this court held in the Hall case. It noted that Mickens in dicta was unclear about whether Sullivan applies broadly to various different types of conflicts. Therefore, this court said it relies on its own precedence and would move forward applying Sullivan to different kinds of conflicts. I want to ask you about some of the evidence introduced in the state court. I didn't make sure I have the record clear. Other than his enrollment in regular high school classes, was there anything else presented to show that he was not intellectually or emotionally limited? For example, the high school he went to, did it offer special education classes? Was he enrolled in any of those classes? There was a record billed in state court on that, Your Honor. Brendan Dassey had an IQ of 73. That was testimony at the suppression hearing. He received special education support services. So while he was in mainstream classes, he received special extra services. So was there an IEP done on him? There's not an IEP in the record, Your Honor. And were the investigators aware of his intellectual or emotional limitations? And if not, was that necessary? They certainly knew his age, Your Honor, and they'd been present at his school. That's where they first picked him up. I don't know whether they knew his precise IQ score, but it's not necessary. Or whether he was getting those kind of support services. That's not in the record. But it's not important here whether they knew. The question of voluntariness is not a referendum on the state of mind of the officers. The question is what message was sent to Brendan Dassey, and did it overbear his will? And when we have someone like Brendan with his slew of limitations, staggeringly suggestible, more suggestible than 95% of the population, a concrete thinker, the kind of person likely to interpret idioms like honesty will set you free, literally. The repeated drumbeat of messages that were sent to him clearly, clearly overbore his will. And what about, look, I've watched the whole thing. I don't see a will being overborne. And what I see also are Miranda warnings. We can use this against you. And we can't make any promises, right? They do say this. So we've got all of that, and we've got vague promises about the benefits of being honest, right? And I don't see any case law comparable that would let us say this was contrary to clearly established federal law on voluntariness. Well, Your Honor, several points. We have a D-2. In fact, the district court granted its relief primarily on D-2 grounds. So, again, clearly established federal law. On the statement that no promises of leniency were made. On the finding of no promises. That's right. Okay. Now, could you address the exchange I had with Mr. Berg about whether these are legally relevant promises when it's these vague assurances? These are absolutely legally relevant promises, Your Honor. It's true that the case law requires a specific promise to be made. But if you survey the case law, you can see the difference between what has been approved by this court and what happened for Brendan Dassey in Rutledge. So what's the best Supreme Court authority showing this was an unreasonable finding? The best Supreme Court authority is Blackburn, which establishes that a confession has to be the product of rational choice. Key word there being rational. That notion has been amplified by this court to mean the product of free will that has not been distorted by a false presentation of the consequences of confessing. Was there any objection to the admission of the phone call to Brendan's mother in the trial court? There was not, Your Honor, and there was a good reason for that. Mr. Kaczynski did not turn over the evidence related to the provenance of that call, including the videotape of Michael O'Kelley interrogating Brendan Dassey on May 12th. He did not produce that to successor counsel. So trial counsel was totally unaware of how that phone call had been brought about. That only came out in post-conviction proceedings. If Kaczynski significantly, if his significantly deficient behavior was enough to get the May 13th interrogation thrown out, why wasn't it enough to get the phone call to Dassey's mother thrown out under a fruit-of-the-poisonous-tree argument? If I understand you to be asking, Your Honor, why didn't trial counsel make that motion, it's precisely because they didn't know the pressures that Mr. Kaczynski and his investigator had applied to Brendan Dassey on May 12th. None of that had been turned over to them. They were in the dark, and post-conviction was the first time that they confronted that series of facts, that series of events that, in fact, led up to the phone call. And they called the admission of that phone call damning. They understood that it was difficult, that it was a challenge for their case, but they didn't have the information they needed to make the proper motion to exclude it at the time as the fruit of ineffective assistance of counsel. Let me ask you this. How are the investigators' statements that everything will be okay coercive or promises of leniency rather than simply false promises of net benefits? Well, Your Honor, they didn't just say everything will be okay. They told him. They started out the whole interrogation. We know you're scared of arrest, but you've got nothing to worry about. As long as you fill in those blanks with statements against your own interests, I'm thinking you're all right. You're okay. That's enough for a 16-year-old developmentally disabled child like Brendan Dassey. That's enough to produce in him an understanding that he was going to go back to school after confessing to rape and murder, which is exactly what we see on the videotape, unmistakable evidence that he confessed on reliance on these false promises. And what counsel is saying is that you're asking us to weigh factors differently than the state court did. Isn't that what you're really doing? That is not what we're asking, Your Honor. We are proceeding under D-2 as well as D-1. So under D-2, we are attacking the state court's unreasonable finding of fact that no promises were made. It's not a re-weighing issue at all. In fact, that's very much why this is a different case than Hardaway and Murdoch and other re-weighing cases that this court has seen. And our D-1 claim, too, I believe is not a re-weighing claim because it goes to the way in which the factors were originally assessed by the state court. The state court found no promises of leniency. So it never considered the true totality here. It never considered the way in which these promises interface with Brendan's vulnerabilities, his suggestibility, his concrete thinking. They never put themselves in the shoes of Brendan Dassey and thought, how would I react to that if I were Brendan Dassey? So that mix has never been weighed before until the district court in this case. You had a question. I did. What was the source of the confession to cutting Ms. Halbach's throat after raping her? I'm not sure I understand your question. It's not news sources, is it? No, Your Honor. So it's either Dassey's memory or his imagination. It's not in the media. You're correct. It's either his memory or his imagination. And as the district court found, it's that sequence of the interrogation in which the interrogators are trying to get him to say. Well, it's clear he's been very resistant up to that point. He's been very reluctant. He's telling a contradictory story that doesn't make any sense, and they're calling him on it. It comes out very slowly and painfully, but he volunteers it. Your Honor, I would respectfully disagree. Every step of that confession, every new fact, every primary plot point is a result of suggestion. Now, it's true that after the interrogators introduce a plot point, they allow Brendan to embellish until the story veers from what they think probably happened and then the researcher. A plot point like what? A plot point. You went inside? You went inside the house, yes. And then you're holding them responsible for all the details that come after that. I'm not holding them responsible, Your Honor, but I'm pointing out that what happened was they used false promises of leniency combined with fact feeding at every crucial step of the story. What's the fact feeding? I guess I'm having trouble with that in the early stages of the interview. Absolutely. I think you went over to Stephen Avery's house at Separate Appendix 54. You went back in that room, Separate Appendix 61. Does he ask you, to Ray Pauldock, Separate Appendix 60? You were there when she died, Separate Appendix 67. Step by step by step. Now, Your Honor is correct that this isn't sequential. This isn't over the course of five minutes. After they give him each step, they allow him to try to tell a story on his own. And what does he do in those moments? He provides information that is provably untrue. He describes, after they put him in the trailer, he describes looking down that hallway and seeing Ms. Halbach shackled to a wooden headboard. But that wooden headboard, we know, has no scratches on it, has no marks, nothing that would be consistent with this horrible story of a woman being raped while she was shackled to it. There's this whole account that they allow him to spin where he's trying to guess how she was killed. This account of throat cutting and stabbing and hair cutting, a bloody scene that would be almost impossible to clean up from. But there's not a trace of forensic evidence from Teresa Halbach in that bedroom, much less Brendan Dassey. So these moments where they're allowing him to spin on his own are provably untrue or they are, like, clockwork from the media. It's when things begin to spin off the rails too much that they bring him back to the account. What came from the media? Many things, Your Honor. The fact that her RAV-4 was found on a salvage yard property. The fact that she was there that day. The fact that her bones were found in the bonfire pit behind Stephen Avery's house. Many aspects like that which many people in the state of Wisconsin knew. And, of course, it was established in the state post-conviction record that, of course, Brendan and his family were watching the news about what was happening to their relative and to their home. Let me take you to closing arguments for a moment because in closing arguments the state asserted that an innocent person would not confess. Now I want to ask you something. Can the state do this? We know, of course, that many, many innocent people have confessed to crimes they haven't committed. Is that a permissible argument? Well, Your Honor, certainly not appropriate in this case to suggest that nobody falsely confesses or in any case because we know that to be factually untrue. In fact, we have an amicus brief exactly to that effect establishing that false confessions happen under circumstances just like this to kids just like Brendan. They're textured. They can be textured with detail. There are examples in the amicus brief of cases like the Central Park Five, other famous cases where young defendants gave interlocking detailed confessions that sounded true that were later proven false. So we know that. We know that not to be true. And I would also point out that in the amicus brief, I think it speaks volumes that the law enforcement interrogation trainers who joined the amicus brief say they used this interrogation video as an example of what not to do. That's how unreasonable the state court decision was in this case. Trainers used this video to show what not to do. You're not suggesting the constitutional standards are best practices of an amicus? I'm not, Your Honor. I'm not. I want to take you back. We touched on it, but I think I, for one, need a bit more. Because in making your argument about Kaczynski's conflict of interest, please address Mickens versus Taylor in a bit more. Certainly, Your Honor. With respect to Mr. Kaczynski's ineffective assistance of counsel, we have raised both a D-2 and a D-1 claim. So let's address first just the D-2 claim here. Yes. Essentially, Mickens is not an issue with respect to the D-2 claim because under D-2 there is no requirement that clearly established federal law be identified to cross the 2254D threshold. So if we pass through that threshold under D-2, then this court finds itself under 2254A, conducting a de novo review of the ineffective assistance of counsel claim. In that case, this court is free to apply the Sullivan standard, notwithstanding Mickens. That's what this court suggested in the Hall case, in which it's noted that the Mickens dicta is unclear. We don't know exactly what's prescribed and what's not. We're going to rely on our own precedent, which applies Kyler v. Sullivan to a variety of different conflicts. Counsel says the dimension in the appellate court's decision of age was sufficient. You don't agree with that view. I don't agree with that. And because it made reference to the underlying trial court's finding that the court really didn't need to do anything more. I don't agree with that view, Your Honor, particularly, again, with respect to the D-2 violation here. We have a state trial court that found no promises of leniency. We have a Wisconsin appellate court that adopted that finding, and then premised on that erroneous factual finding, they weighed the remaining factors, didn't sufficiently account for the fact that he is 16 years old, didn't address the way in which this message of leniency would be heard by a 16-year-old with developmental disabilities. There is no need when you have someone like Brendan Dassey. You don't have to make explicit statements like you're going to go to prison but for less time. You don't need to do that with someone like Brendan Dassey. It's enough to say everything's going to be okay. You have nothing to worry about. Is there any physical evidence at all that ties Dassey to the murder? That ties Dassey to the murder? No, Your Honor. There is nothing that did not come from the fact-feeding that occurred during this interrogation. I expect you'll hear the state suggest that he led them to a bullet in the garage. That's not the case. If you watch, as I'm sure Your Honor has, when you watch the videotape in this case, Brendan has the shooting at first happening outside by the bonfire pit, and the officers say to him, because they know, they found 10 shell casings in that garage already. They say to him, No, no, Brendan, we know some things happened in that garage. We need to get the honesty about the garage. That's when he moves the murder into the garage. Then they research the garage and discover this bullet. That corroborates not Brendan Dassey's account but the interrogator's account. And the issue of her bag and phone and camera that were missing, that was provided by the investigators. Absolutely, Your Honor. That's one of the classic examples in this interrogation of fact-feeding, a sequence of events in which they teach him. They teach him the answer that they're looking for. When he cannot come up with this information, they end up feeding him the specific facts. Her purse, her camera, her cell phone were in the burn barrel. Only then does he regurgitate it back. If there are no further questions, we would ask the district court. Excuse me, we would ask the Court of Appeals to affirm. Thank you. Mr. Berg, would you please give Mr. Berg three more minutes on top of whatever he had left? I want to start with Judge Hamilton's question about what is the most relevant Supreme Court case. The most relevant Supreme Court case is Fair. Fair, Michael C. v. Fair. Fair, the court held that a 16-year-old can make a voluntary statement even without the presence of a friendly adult. The police there made statements that were similar to those here, and the Supreme Court said those statements were far from threatening our courses. Isn't that the 16-year-old that had a lot of experience with the police? I think he had more experience than Dassey did, that's true. Well, Dassey had none. So that's a factor that cuts in the other direction, but there are other factors that cut the other way. So in Fair, the police arrested the 16-year-old, Dassey wasn't under arrest, and they also denied his request to see his probation officer. Nothing like that happened here. Again, I think it's the closest Supreme Court case. It's not perfectly on point. Obviously there's going to be factors that cut in different directions in every case. I second want to just recap our four points. Nothing the officers said here was a specific promise. That's what the cases require. There was a specific warning to the contrary. We can't make any warnings. In other words, you can have a hundred fairly specific promises, not specific. You can have a totality of all of this, and it will never reach... No court has ever held that. And we're on habeas review here. So there has to be clearly established law to establish that principle, and there is none. Also, the specific warnings contradicted any implications from any of those vague statements. The context explains all of those vague statements, and we have specific evidence that Dassey's will was not overborne. Now I want to address briefly your questioning about Sullivan. Counsel for the opposing side cited Hall v. United States. That was a de novo case. So it's okay to try and extend Sullivan in de novo cases, but we're on habeas again. So all that matters is clearly established law. And Mickens clearly says Sullivan is not clearly established for anything but concurrent multiple representation. I'll make one final point, and then I want to sit down. What if we don't want you to? Unless there's more questions. Unless there's more questions.  are his memories of Teresa, because that's what you would expect would be burned into his mind, and none of them were suggested by the officers. He remembers her screaming, help me, and seeing her naked and chained up to the bed. He remembers her crying and pleading with him to stop while he raped her. He remembers her breathing after Avery stabbed her in the stomach, and that she's still struggling to breathe after he cut her throat. He remembers that her belly wasn't moving as they carried her out to the garage. And he remembers the awful smell as her body burned. None of those memories were planted. They were raw and real. Dassey wanted to get them out, and he did so voluntarily. I would ask this court to reverse the district court's unprecedented order. Thank you. I want to thank both sides, both the government and Mr. Dassey's lawyers, for a case very well briefed and very well argued. Thank you for the assistance that you have given the three of us. And the case will be taken under advisement. Thank you.